### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

---

|  |  |  |
|---|---|---|
| ROSEMARIE REARDON, SCOTT REARDON, JOHN BURTON, TRUSTEE and SCOTT REARDON IV, TRUSTEE, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. |
| | : | 3:11- cv-01092 - CSH |
| - against - | : | |
| | : | |
| DAVID KEATING, ZONING ENFORCEMENT OFFICER OF THE TOWN OF DARIEN, IN HIS OFFICIAL CAPACITY; JEREMY GINSBERG, DIRECTOR, PLANNING AND ZONING DEPARTMENT, IN HIS OFFICIAL CAPACITY; THE TOWN OF DARIEN; JAMES ECKERT and JANEEN ECKERT, | : | |
| | : | |
| | : | **OCTOBER 29, 2013** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

### RULING ON DEFENDANTS' MOTIONS TO DISMISS
### SECOND AMENDED COMPLAINT

**HAIGHT, Senior District Judge:**

This case is a Tale of Two Houses in the Town of Darien, Connecticut. The houses stand on neighboring lots on Long Neck Point Road in Darien, overlooking the waters of Long Island Sound. The owners of one house are aggrieved by renovations and enlargements made to the other house by its owners. That construction was approved by zoning officials of the Town. Plaintiffs, the aggrieved house owners, contend that the Town officials' procedures relevant to that approval deprived Plaintiffs of rights guaranteed by the United States Constitution, and also violated state and local statutes and ordinances. They bring this action for legal and equitable relief against two groups of Defendants: (1) the Town and certain Town officials ("the Town Defendants"); and (2) the

1

owners of the other house.

This Court's subject matter jurisdiction depends entirely upon Plaintiffs' constitutional claims.[1] There is no diversity of citizenship between the parties, 28 U.S.C. § 1332(a), and no other basis for federal jurisdiction. Plaintiffs' claims under state and local law are asserted under principles of pendent jurisdiction.

Plaintiffs' Second Amended Complaint ("SAC") is the operative pleading. Doc. 64. It contains five counts. The first three counts allege constitutional violations by the Town Defendants. The last two counts allege violations of state and local laws. Specifically, Count I alleges violation of Plaintiffs' constitutional guarantee of the right to petition; Count II alleges violation of Plaintiffs' constitutional guarantee of equal protection; and Count III alleges violations of Plaintiffs' guarantees of equal protection and substantive due process. Paragraph 200 of the SAC, with which Count III concludes, alleges: "By denying the plaintiffs of the security of the status quo while their appeals were (and are) pending, the Town and defendant Keating discriminated against the plaintiffs as a class of one." *Id.*, ¶ 200. It is apparent throughout the SAC that, to the extent Plaintiffs are asserting an equal protection claim, they are proceeding on the theory of a "class of one."

The groups of Defendants, separately represented by different counsel, now move to dismiss Plaintiffs' Second Amended Complaint ("SAC"), which is the operative pleading. Doc. 65, 67, & 71. Plaintiffs resist the motions. The motions to dismiss have been extensively briefed. Counsel made oral arguments of high quality. This Ruling resolves the motions.

_____

[1]   *See*   28 U.S.C. § 1331   ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## I. BACKGROUND

### A.  Preliminary Considerations

Defendants move to dismiss Plaintiffs' Second Amended Complaint pursuant to two provisions of Rule 12(b) of the Federal Rules of Civil Procedure: lack of subject matter jurisdiction, Rule 12(b)(1); and failure to state a claim upon which relief can be granted, Rule 12(b)(6).

The Defendants' motion papers and Plaintiffs' opposing papers include as exhibits a number of documents generated by proceedings before and appeals to the Town Defendants and to Connecticut state courts with respect to the underlying land use issues in the case at bar.  I must consider the extent to which I may consider such material in the context of motions to dismiss.  In *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986), the Second Circuit said:

> Under Rule 12(b), a "speaking" motion, i.e., a motion that includes evidentiary matters outside the pleadings, is properly converted to a Rule 56 [summary judgment] motion only when it is made under Rule 12(b)(6): failure to state a claim.  However, when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise."

In a more recent Summary Order, the Second Circuit cited *Kamen* for the proposition that "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to and rely on competent evidence outside the pleadings." *Giammatteo v. Newton*, 452 F. App'x  24, 27, 2011 WL 6157339 (2d Cir. Dec. 13, 2011).

To the extent that the present motions fall under Rule 12(b)(1), these authorities enable me to consider the evidentiary matters submitted by the parties.  The documents in question are relevant to the issues, and no issues of authenticity or admissibility arise with respect to them.

To the extent that the motions fall under Rule 12(b)(6), the SAC incorporates or refers to

a number of documents.  The Second Circuit has recognized that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding into one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal quotations and citation omitted).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citation omitted).  It is equally well settled that I may take judicial notice of published state and local laws and regulations, and court decisions, that are relevant to the issues presented by these motions.

Guided by these principles, I will consider the materials submitted by all parties in connection with and in support of their contentions on the issues that arise under both Rule 12(b)(1) and Rule 12(b)(6).

In *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58-59 (2d Cir. 2010), the Second Circuit resolved any pre-existing doubt and held that a land-use case such as a "class of one" equal protection claim was subject to the pleading standard set out in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "Under *Iqbal*, factual allegations must be sufficient to support legal conclusions." *Ruston*, 610 F.3d at 59.  Chief Judge Jacobs also stated in *Ruston*: "This account of the dispute is derived from the Rustons' January 12, 2009 amended complaint, the factual allegations of which are accepted as true to the extent they are non-conclusory for the purposes of a motion to dismiss." *Id*. at 57 n. 1.  That distinction resonates in the case at bar,

because Plaintiffs' 215-paragraph SAC contains a generous measure of allegations that are solely, even unabashedly conclusory.  Having submitted the SAC to the necessary rites of distillation, reduction and purification, I will set forth an account of the disputes involving the Reardons, the Town, and the Eckerts that is derived principally from the residue: well-pleaded allegations of fact, whose truth I accept on these motions to dismiss.

**B.      The Factual Allegations in the Second Amended Complaint**

Unless otherwise noted, the account appearing in this sub-part  is based upon those allegations in the SAC that are factual in nature.  Conclusory or argumentative allegations are disregarded.

Plaintiff Rosemarie Reardon is a part owner of and resides in a single family residence at 169 Long Neck Point Road ("the Reardon Property").  Plaintiff Scott Reardon, Rosemarie's husband, also resides in the Reardon Property.  He has no ownership interest in it.  The Sunrise Trust, a South Dakota trust established for the benefit of the Reardons' children, is a part owner of the Reardon Property.  Plaintiff John Burton is a trustee of the Sunrise Trust, as is Plaintiff Scott Reardon IV.

The house located on the Reardon Property was built in 1905.  The Reardons have lived there since 1993.  The house stands upon elevated ground, and its occupants, as well as members of the public passing along an adjacent roadway, have enjoyed an unfettered view of Long Island Sound, across an adjacent waterfront parcel to the east, at 165 Long Neck Road.

The Reardon Property includes a waterfront parcel of land ("the Waterfront Parcel") that was acquired by the Reardons as part of their purchase of the residence.  The Waterfront Parcel is accessed by a 6-foot wide easement traversing the southern boundary of the adjacent property at 165

Long Neck Point Road.

In 2007, that adjacent property at 165 Long Neck Point Road was acquired by Defendants James Eckert and Janeen Eckert, husband and wife, who now own the property jointly (hereinafter "the Eckert Property").

From 1924, the Eckert Property included a late 19th century ox barn that had been converted into a more than 6,000 square foot family residence. This structure did not conform to the Town of Darien's zoning code, adopted in 1951, and was a nonconforming structure upon the code's enactment.

In or about August, 2009, James Eckert wrote to the Reardons. Eckert said that he and his wife did not want to renovate the "barn" house. They preferred building a new house that would be set directly in front of the Reardon residence and would block both the Reardons' and the public's view of Long Island Sound. Eckert presented the Reardons with a marked drawing delineating two possible renovation plans, one with a greater, the other with a lesser amount of view obstruction. Eckert said to the Reardons, in substance, that the Eckerts would choose the path of lesser obstruction if the Reardons ceded the Waterfront Parcel to the Eckerts without compensation, failing which the Eckerts would build a large new house directly in front of the Reardons' residence.

The Reardons refused to cede the Waterfront Parcel to the Eckerts and, during the next several months, made several proposals to the Eckerts about shared use of the Waterfront Parcel, which the Eckerts rejected because they wanted full ownership of the Parcel, without compensating the Reardons for it.

Between the Eckerts' original proposal in August 2009 and the winter of 2010, the Reardons had a number of meetings and conversations with Town of Darien officials, including Defendant

David Keating, the Zoning Enforcement Officer. The Reardons expressed concern about the magnitude of the planned Eckert construction and its impact upon their primary residence and Waterfront Parcel. The Reardons also had conversations with Keating about their plans for developing and modifying their Waterfront Parcel. On each occasion, the Town officials said there was nothing they could or would do about the Eckerts' planned construction, and were negative about the Reardons' tentative Waterfront Parcel plans.

On January 11, 2010, the Reardons' counsel wrote to counsel for the Eckerts and inquired if it might be worthwhile to renew discussions about possible renovations to the Eckert Property.[2] James Eckert replied directly to the Reardons, stating that he was traveling and was busy at his office, but added that "as always we are open to sensible discussions and welcome any other recommendations . . .Again happy to listen to anything – let's touch base the second week of February if that works for you."

James Eckert did not contact the Reardons in February 2010. On or about March 8, the Eckerts submitted to Keating, the Town Zoning Enforcement Officer, plans for a major $2,000,000-plus "renovation" of the original structure on the Eckert Property. These plans included a complete demolition of the existing structure, and construction of a large new north-south wing and separate two story garage/apartment structure that would block about 85% of the Reardons' water view and a greater proportion of the view the public enjoyed from the adjacent public road.

The Eckerts did not notify the Reardons that they were submitting these plans to Keating. Keating did not notify the Reardons that he had received them. Keating reviewed the Eckert application and approved the issuance of the prayed-for building permits "within weeks" of receiving

---

[2] It would appear that by this time the two families had, in the vernacular, "lawyered up."

them.

A construction company appeared on the Eckert property in July 2010. The Reardons observed the company's arrival (presumably with discomfiture), and checked the Town file with respect to the Eckert Property. They found nothing relating to an exemption from Town zoning regulations with respect to the Eckert Property construction: no notes, no memoranda, no evidence of deliberation or analysis by Town officials that would conform to a "determination" that the Darien Zoning Regulations ("DZR") required, as the Reardons construed them, before the Eckert construction could lawfully go forward. This seeming absence of a determination by Keating or his office deprived the Reardons of the right to appeal the construction to the Darien Zoning Board of Appeals ("ZBA"), which under the DZR can be invoked only in the presence of a "decision" or "determination."

In that circumstance, the Reardons engaged an engineer, John Kellard, to review the Eckerts' construction plans in the Town file, in order to form an opinion as to whether such an exemption would have been possible under the Town's zoning code, had such a review been conducted and a determination been made with respect to it. Kellard concluded, in a 6-page engineering report, that within the context of zoning regulations, the Eckerts' submissions were defective in various respects, and a full Coastal Site Plan Review ("CSPR") was required by relevant laws and regulations to be held, with actual notice to abutters and an opportunity to be heard. On September 29, 2010, the Reardons submitted to the Town a detailed written submission of the need for a CSPR, attaching a copy of the Kellard report. The Town officials did not respond to the Reardons' submission, which the SAC characterizes at ¶ 83 as a "detailed, documented citizens' complaint," and at ¶ 186 as a "notice of violation." Neither did Keating or other Town officials take any action with respect to the

8

charges and contentions contained in the Reardons' September 29, 2010 submissions.  Construction at the Eckert Property continued without interruption.

On November 10, 2010, the Reardons "took an appeal of Keating's refusal to enforce to the Zoning Board of Appeals," SAC ¶ 100, a step further described in SAC ¶ 105: "on November 10, 2011 the Reardons appealed Keating's refusal to enforce the Darien Zoning Regulations relating to coastal protection and his refusal to rescind the construction permits."  Doc. 64, ¶¶ 100, 105.

On February 16 and March 2, 2011, the Darien ZBA held hearings on the Reardons' appeal with respect to the Eckert Property.  At the request of the Eckerts, the ZBA raised the issue of whether it had jurisdiction to hear appeals relating to zoning regulation enforcement issues.  On March 2, 2011, the ZBA concluded that it had no authority to review enforcement decisions by the Town, and accordingly refused to exercise jurisdiction over the Reardon appeal.  The Reardons filed an appeal of the ZBA's ruling with the Superior Court of Connecticut, which was pending on appeal when the SAC was filed on April 22, 2013.[3]  *See Reardon, et al. v. Darien Zoning Bd. of Appeals*, No. FST-CV-6008856-S (filed 3/28/2011 in Connecticut Superior Court, Judicial District of Stamford).

In addition to these events centering upon the Reardons' "citizens complaint" dated September 29, 2010, the SAC also alleges that on November 12, 2010, the Reardons filed state statutory Notices of Intervention in subsequent proceedings relating to the Eckert construction, which in the Reardons' view granted them rights of notice and participation.  Thereafter, Keating issued additional construction permits to the Eckerts, without giving the Reardons a right to be heard.

---

[3]  Subsequent developments in that litigation are described in Part II.A.1., *infra*.

9

## II.  DISCUSSION

**A.**     **Plaintiffs' Constitutional Claims**

The main thrust of Plaintiffs' action in this federal court is that the Town Defendants, by their acts of omission and commission in connection with the Eckert Property, deprived Plaintiffs of several rights guaranteed to them by the United States Constitution.  The Eckerts are not named as Defendants in the SAC on account of their conduct, but because the relief sought by the Reardons, if granted, would impact directly upon the Eckert Property.

The constitutional claims the Reardons allege against the Town Defendants are deprivations of the Reardons' right "to petition the Government for a redress of grievances," conferred by the First Amendment; the Reardons' right to "due process of law," conferred by the Fifth Amendment; and the Reardons' right to the "equal enforcement of the laws," conferred by the Fourteenth Amendment. The Fourteenth Amendment also makes the First and Fifth Amendment rights binding upon the Town Defendants.

These three claims will be discussed in that order.

### 1.     *Right to Petition*

Ratified in 1791, the First Amendment to the United States Constitution guarantees "the right of the people . . . to petition the Government for a redress of grievances."   Courts refer to this language as "the Petition Clause." The right to petition "has  been incorporated into the Fourteenth Amendment  to the United States Constitution and is therefore applicable to the states." *Nicholson v. Moran*, 835 F.Supp. 692, 695 & n.7 (D.R.I. 1993) (citing *DeJonge v. Oregon*, 299 U.S. 353, 364 (1937)).  In consequence, the question that arises in the case at bar is whether the Town Defendants

10

or any of them abridged the Reardons' right to petition for a redress of that grievance the Reardons clearly feel deeply, caused by the construction on the Eckert Property.

It is necessary to expand upon the pertinent facts as alleged in the Second Amended Complaint.   What follows is drawn principally from the Town's files, which document communications made and actions taken with respect to construction at the Eckert Property.   Such material may be considered on this motion to dismiss because Plaintiff's SAC describes, or incorporates by reference, or complains of the conduct recorded and captured by these records, which are for the most part public in nature, and could in any event be judicially noticed.   In its review of a motion to dismiss, a court may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." *Western World Ins. Co. v. Architectural Builders of Westport, LLC*, 520 F.Supp.2d 408, 410 (D.Conn. 207) (citing and quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).   "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Mihaly v. Town of Trumbull Water Pollution Control Auth.*, No. 3:12-cv-1157 (JBA), 2013 WL 2948329, at *2 (D.Conn. June 14, 2013) (Arterton, *J.*) (citing and quoting *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010)(internal quotations omitted)).

The Plaintiffs' "citizens complaint" dated September 29, 2010 [Doc. 64-1] was written by Alan H. Kaufman, Esq., the Reardons' attorney, and jointly addressed by him to Defendant Jeremy Ginsberg, Director of the Town of Darien Planning and Zoning Department, and to non-party Charles A. Saverine, an "Official" of the "Building Department."   (Paragraph 186 of the SAC describes Saverine as the Town's "chief building department official").   Mr. Kaufman enclosed with

11

his letter a copy of the Kellard engineering report, commissioned by the Reardons, which discussed the Eckert construction plans.   Mr. Kaufman argued from the Kellard report that the zoning, construction and other permits the Eckerts previously obtained from the Town "were premised on information submitted by the applicants that was substantially inaccurate," which "served as the primary factual source for the finding that allowed this environmentally defective construction project to enjoy an exemption from the Coastal Site Plan Review (CSPR) process." Doc. 64-1 at 2. Counsel concluded with a request that the Town undertake a CSPR review.  He wrote of the Eckerts:

> But the law required candor and accuracy when they approached the town in February to seek an exemption from CSPR, not belatedly when their errors are uncovered by others.  We respectfully suggest that their failure to have done so mandates that the town, the public, and the neighbors be given the due process of a full Coastal Site Plan Review.

*Id*. at 7.

The Town officials made no response to this communication.   The Reardons interpreted that silence as a decision by the Town to reject their demand for a CSPR review and allow the Eckert Property construction to continue.   Mr. Kaufman submitted on their behalf to the Town of Darien ZBA an "Application Form" [Doc. 21-1, p. 15] requesting the ZBA's approval of an "[a]ppeal of a decision, order, requirement or determination of the Zoning Enforcement Officer under Section 1122 of the Darien Zoning Regulations," specifically, the "affirmation of building & related permits per G.S. Ch. 124, sec. 8 et seq. for property located 165 Long Neck Point Road" (the Eckert Property). The same form with identical entries appears in the record as Doc. 21-1, p. 25.  Doc. 21-1, p. 37-41, is a five-page typed statement furnished by Mr. Kaufman in response to "Item K" on the form, which directs the applicant to give details with respect to "the purpose and explanation of this application."

12

It appears from the record that the form was first filed on or about November 17, 2010, although the Item K statement is date stamped "Feb 4, 2011," which may be the date it was submitted to the Town. The Item K statement begins by saying:

> The core issues in this appeal are focused and limited. They present questions of enforcement of Darien zoning and environmental regulations by the Zoning Enforcement Officer, Planning & Zoning and the Building Department. In essence there is one core issue: when confronted with documented evidence that a coastal site plan review exemption has been granted but was based on inaccurate and incomplete submissions, must the Enforcement Officer correct the error and undo the mistake.

The "documented evidence" referred to in the Item K statement is the Kellard report, forwarded to Town officials with counsel's September 29, 2010 letter of complaint.

The Darien ZBA placed the Reardons' "application for an appeal" on its calendar for a public hearing on February 16, 2011. The hearing began on that date, and was carried over to the next ZBA public hearing on March 2, 2011, on which date the ZBA concluded the public hearing, deliberated, and voted to deny the application. The detailed minutes of these two sessions comprise single-spaced typed pages 43 to 61 of Doc. 21-1, containing 119 numbered paragraphs. The minutes show that the proceedings were spirited and contentious. At the February 16 hearing, Mr. Kaufman appeared for the Reardons (who did not attend); Wilder Gleason, Esq., an attorney for the Eckerts, appeared together with James Eckert; Defendant David Keating, the Town Zoning Enforcement Officer, attended, answered questions put to him by ZBA members, and was examined by Attorney Kaufman; a Town Compliance Officer, Robert Woodside, also attended. The tenor of the public hearings may be gleaned from these entries in the ZBA minutes:

> 10. Wilder Gleason [counsel for the Eckerts] said that in this case, the applicant [Reardon] sat for months watching construction at the

13

Eckert property before bringing this appeal.  He said that the Eckerts have done things properly, and that exactly this kind of thing is why the statute is in place establishing a limiting timetable for bringing an appeal of a construction permit.

*          *          *          *

21.   Jim Eckert said that this has been a devastating and stressful matter for him and his wife.  He said that he spoke to the Reardons in July of 2009 about his proposed project and gave them 3 basic design options.  He said  the Reardons didn't like any of the options.  Mr. Eckert said he then proceeded to complete plans and he submitted his construction documents properly in March of 2010.  He said he now wants to proceed to finish his project.

*          *          *          *

51. [During the March 2 hearing] Mr. Kaufman then said that he didn't know Mr. Keating would be there and be a witness tonight in this manner.  He said he thought that this would just be a legal argument.  ZBA staff pointed out that Mr. Keating' s presence was routine with an apparent appeal of his decision.  Gary Greene [ZBA chairman] asked that the attorneys work together so that there are no surprises.  Mr. Kaufman then proceeded to question Mr. Keating.

*          *          *          *

82.   Gary Greene then asked Mr. Kaufman what issue he was appealing and when did it occur.  After further questioning Mr. Kaufman answered that he is appealing their failure to act in early October on the September 29 letter.  He repeatedly claimed that the ZEO filibustered and did nothing.

Doc. 21-1, p. 45, 46, 51, 56-57.

On March 2, after closing the public hearing, the ZBA members deliberated and then passed

the following Resolution:

> NOW THEREFORE, BE IT RESOLVED, that <u>ON MARCH 2, 2011 THE ZBA DENIED</u> the application as set forth in the Legal Notice on the grounds that the appeal of the issuance of the project permits was beyond the time limit specified by State Statute and the Darien

14

> Zoning Regulations; and
>
> ON MARCH 2, 2011 THE ZBA DENIED the appeal from the decision in whatever form of the Zoning Enforcement Officer regarding the September 29, 2010 letter, and/or his failure to respond to such letter, on the grounds that this is not an appealable event within the jurisdiction of the ZBA.

Doc. 21-1, p. 61.

The Reardons filed an administrative appeal from the Town of Darien Zoning Board of Appeals' resolution in the Connecticut Superior Court, Stamford/Norwalk Judicial Division. The appeal sought equitable relief, prayed for as follows:

> [T]he Reardons and Sunrise Trust appeal the decision of the ZBA and pray that this Court sustain their appeal, that the decision of the ZBA be declared null and void, and that this matter be remanded to the ZBA with instructions requiring the ZBA to properly consider the Plaintiffs' claim that the Eckert construction has been, and continues to be, performed in violation of Darien Zoning Regulations.

Doc. 69-1 ("Appeal"), p. 15. The Superior Court (David R. Tobin, *Judge*) took evidence and on February 17, 2012 issued a decision, Doc. 69-1, p. 38-58, which identified the issue in the appeal as "whether the zoning enforcement officer made a decision with respect to the issues raised in Kaufman's September 29, 2010 letter," *id.*, p. 51, and concluded: "The court finds that the record contains substantial evidence supporting the board of appeals' determination that the zoning enforcement officer did not make a decision that could be appealed to the board of appeals under General Statutes §§ 8-6 and 8-7." *Id.*, p. 58 (footnote omitted). For that reason, the Superior Court dismissed Plaintiffs' administrative appeal.

Plaintiffs filed a notice of appeal from the Superior Court's decision with the Connecticut Appellate Court. Plaintiffs stated the issues on appeal to be, in substance, whether the local zoning

enforcement officer reached a "decision" or "determination" to reject Plaintiffs' September 29, 2010 complaint that was appealable under the Connecticut statute; whether the local zoning enforcement officer could deprive Plaintiffs of their right to appeal by concealing his determination; and whether the Superior Court erred in ruling that the local zoning enforcement officer did not make a statutorily appealable decision or determination. *See id.*, p. 65. As provided for by Connecticut procedures, the Supreme Court of Connecticut on its own initiative removed the case from the Appellate Court and took it unto itself, where the Reardons' appeal is now pending undetermined.

Plaintiffs' allegations in ¶¶ 134-145 of the SAC set forth the core of their Petition Clause claim. Plaintiffs allege that the Town Defendants disregarded perceived statutory and regulatory procedural requirements concerning exemptions of property from environmental laws, which "deprived the public and the Reardons of their First Amendment right to petition." Doc. 64, ¶ 138. They allege that the Town "deprived the plaintiffs of their right to petition," *id.*, ¶ 140, when they presented Town officials with Kaufman's September 29, 2010 letter and enclosed Kelland engineering report, which was "an effort by the Reardons to petition the town government to rectify unlawful conduct that was impacting them and other town residents," *id.*, ¶ 141, but the Town Defendants "disregarded the September submission," *id.*, ¶ 142. "They conducted no investigations, consulted no experts and refused to reply to the Reardons." *Id.* Thereafter, the Town Defendants claimed "they had not made a 'decision' about the violations," a denial whose sole purpose "was to curtail and complicate the plaintiffs' ability to take an appeal to the ZBA." *Id.*, ¶ 143. Paragraph 145 alleges:

> Because the town's decision to enforce or not enforce the zoning laws, as demanded by the Reardons, would trigger certain administrative and/or judicial appeal rights for the Reardons, the

'pocket veto' by the town defendants operated to, and was intended to, frustrate the Reardons' rights to petition and thereby constituted a violation of the First Amendment.

The manner in which Plaintiffs plead their Petition Clause claim demonstrates that the claim must be dismissed as a matter of law. *Au fond*, Plaintiffs' claim is that their petition to the Town Defendants fell upon deaf, even obstructive, ears. However, the First Amendment guarantees the people's right to *petition* their government: not to petition *successfully*. In *Kittay v. Giuliani*, 112 F.Supp.2d 342, 354 (S.D.N.Y. 2000), *aff'd,* 252 F.3d 645 (2d Cir. 2001), District Judge Barrington Parker (as he then was) rejected a landowner's bankrupt estate's challenge to the constitutionality of zoning regulations enacted to protect New York City's watershed. On the right to petition claim, Judge Parker said:

> Finally, plaintiff alleges that his First Amendment right to petition the government for redress was abridged when government officials contracted away their right to challenge the MOA or the Regulations in the future. The right to which plaintiff refers, however, is not a restriction on the right of governmental bodies to deal with each other. The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. It does not guarantee, as plaintiff contends, that governmental officials may not enter agreements terminating, settling or prospectively avoiding litigation, *nor does it ensure that an elected official will necessarily act in a certain way or respond in a certain manner to requests from his constituents*. . . . As plaintiff does not allege that the MOA or Regulations *prevented him from communicating any grievance to elected officials*, or that *his access to the courts is somehow denied by the Regulations*, plaintiff's First Amendment facial claims are dismissed.

112 F.Supp.2d at 354 (emphases added).

Judge Parker's reasoning resonates in the case at bar because the record shows that the Reardons had the right to communicate their grievance directly to Town of Darien officials, and had

access to the Connecticut courts when dissatisfied with the officials' response.   Kaufman communicated the Reardons' September 29, 2010 complaint to Town officials Ginsberg and Saverine; they referred it to Zoning Enforcement Officer Keating; Keating testified at the February 16, 2011 ZBA public hearing that he took no action on the complaint because he concluded it lacked merit.[4]  Kaufman communicated the Reardons' application for appeal to the Town ZBA, which conducted a-two session public hearing  in response to it, and then denied the appeal.  Thereafter the Reardons exercised their rights of access to the Connecticut courts by appealing the ZBA resolution, first to the Superior Court, and then the Supreme Court of the State by way of the Appellate Court.

More  recently,  after  *Kittay*,  the  District  of  Columbia  Circuit  decided  *We the People Foundation, Inc. v. United  States*, 485 F.3d 140 (D.C. Cir. 2007), in which an organization and its individual members, who viewed the federal government's taxation practices as unconstitutional, submitted lists of inquiries to various government agencies and asserted a violation of the Petition

---

[4]   According  to  the  ZBA  minutes,  Doc. 21-1 at p. 52,  the  following  transpired  at  the March 2, 2011 public hearing:

> Mr. Kaufman asked what is the procedure that is followed if you learn that a Building Permit has been issued that doesn't conform to the Zoning Regulations.  He also questioned Mr. Keating relative to the Building Department's procedures and practices relative to possible violations.   Among other questions he also asked Mr. Keating similarly about some procedures related to Mr. Kaufman's September 29, 2010 letter, and if Mr. Keating had read it and the Kellard report. Mr. Keating answered, "Yes," and he concluded the allegations in the report were of no merit" and not substantiated.  In response to Mr. Kaufman's repeated assertions, he repeatedly said he simply made no decision regarding the September 29 letter or the Kellard report.  In response to another question Mr. Keating said he did not call Mr. Kellard or any other engineer, however he gave his opinion on the matter to the Planning and Zoning Director Jeremy Ginsberg who also didn't see any merit in it.

Clause when those agencies did not respond.  Affirming the district court's dismissal of the complaint, the court of appeals said:

> Plaintiffs contend that they have a right under the First Amendment to receive a government response to or official consideration of a petition for a redress of grievances.  We disagree.
>
> In cases involving petitions to state agencies, the Supreme Court has held that the Petition Clause does not provide a right to a response or official consideration.

485 F.3d at 143.  The D.C. Circuit cited two Supreme Court decisions: *Smith v. Arkansas State Highway Employees*, 441 U.S. 463 (1979), and *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271 (1984).  In *Smith*, state highway commission employees argued that a state agency violated the First Amendment by not responding to or considering grievances the employees submitted through their union.  The Court held that "the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it."  441 U.S. at 465.  In *Knight,* the Court evaluated a state law requiring public employers to discuss certain employee matters exclusively with a union representative, thus preventing non-union employees from discussing those matters with their employers.  The Court rejected the non-union employees' constitutional claims:  "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate and petition require government policymakers to listen or respond to individuals' communications on public issues."  465 U.S. at 285.

The plaintiffs in *We the People* sought to distinguish *Smith* and *Knight* on the ground that "those cases addressed petitions to state officials regarding public policy, not claims that the Federal Government has violated the Constitution."  485 F.3d at 143.  The D.C. Circuit rejected that effort.

The court quoted scholars "arguing based on the plain text of the First Amendment that the right to petition the government for a redress of grievances really is just a right to petition the government for a redress of grievances," and noting "that the Petition Clause by its terms refers only to a right 'to petition'; it does not also refer to a right to response or official consideration." *Id.* at 144 (citations omitted). While the D.C. Circuit acknowledged contrary scholarly views, it held that the Supreme Court's decisions in *Smith* and *Knight* settled the question:

> We need not this resolve this debate, however, because we must follow the binding Supreme Court precedent. And under that precedent, Executive and Legislative responses to and consideration of petitions are entrusted to the discretion of those Branches.

*Id.* at 144-145 (additional citation omitted).

Judge Parker's decision in *Kittay* – that an individual's right to petition government does not "ensure that an elected official will necessarily act in a certain way or respond in a certain manner to requests from his constituents" – cites the Supreme Court's decision in *Knight;* and indeed, the Court's decision in *Smith* took the reasoning one step further: "the First Amendment does not impose any affirmative obligation on the government to listen, [or] to respond" at all, 441 U.S. at 465. In the face of these governing authorities, the Reardons' brief misses the mark by a wide margin when it argues that "the First Amendment is not satisfied simply because a town may permit citizens to file papers. The First Amendment right to petition also incorporates *the way in which those papers are treated*." Doc. 78, p. 14 (emphasis added). If the First Amendment does not obligate a town to make any response at all to a citizen's papers, it is impossible to discern a constitutional violation in Darien's failure, vehemently proclaimed by the Reardons, to treat their papers with *politesse,* or to accept substantive arguments urged by those papers.

20

However, the Reardons make an additional argument in support of their First Amendment claim. The Reardons criticize the actions taken by Town officials in response to Mr. Kaufman's September 29, 2010 letter complaint, and argue in their brief that "the events that followed the Reardons' letter are sufficient to allow a plausible inference that the [Town] Defendants acted to punish and retaliate against the Plaintiffs for their exercise of their First Amendment right to petition." Doc. 78, p. 18. In land-use regulation cases such as this one, Second Circuit authority recognizes a constitutional claim if an individual petitions a government for relief, and the government retaliates against the individual for having done so. *See Dougherty v. Town of North Hempstead Bd. of Zoning*, 282 F.3d 83 (2d Cir. 2002), and *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994). Such a claim lies under 28 U.S.C. § 1983. "To establish a retaliation claim under § 1983 in this case, Dougherty must show that (1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's action." *Dougherty*, 282 F. 3d at 91 (citations omitted).

In the case at bar, the Reardons' SAC clearly satisfies the first element. Their September 29, 2010 letter to Town officials complaining about construction on the Eckert Property was constitutionally protected speech. No one contends otherwise. The decisive question is whether the SAC adequately alleges the second element of a retaliation claim: that the Plaintiffs' September 29, 2010 letter "prompted or substantially caused" specific action by Town Defendants of which Plaintiffs complain, which is to say, that Defendants took that action with the intent of retaliating against Plaintiffs for having written their September 29 letter of complaint.

In approaching that question, it must be observed at the outset that of all the criticisms Plaintiffs make about the Town Defendants' acts in alleged disregard of state statutes and town

regulations, their initial and most serious criticism is "the Town's failure to conduct the state-mandated evaluation that its own regulations required in order to exempt the Eckert project from the stringent zoning regulations designed to implement the Connecticut Coastal Management Act." Doc. 78, p. 2-3. This is the first in a list of six "intentional acts" with which Plaintiffs begin their 48-page brief in opposition to Defendants' motions to dismiss: *id.*, at p. 2-3. It is the Original Sin in this suburban Garden of Eden, from which all other perceived transgressions flow. However, the allegations of the SAC, Doc. 64, ¶¶ 34, 35, & 49-53, show that this alleged failure, charged principally against Defendant Zoning Enforcement Officer Keating, occurred in March 2010. Whatever the shortcomings of the Town's issuance of building permits to the Eckerts may or may not be, that issuance cannot be said to be in retaliation for the Reardons' exercise of their right to petition the Town, for the Reardons did not submit their petition until September, six months later.

One might think that this observation does no more than state the obvious, and can play no or little part in the legal analysis. Indeed, Plaintiffs' brief at 18 focuses upon "events that followed the Reardons' letter" as being "sufficient to allow a plausible inference" of retaliation. But there is more to the point than perhaps meets the eye. If the Town Defendants' post-complaint acts demonstrate a continuing course of conduct in which an intent to retaliate against Plaintiffs plays no discernible part, a claim for retaliation is not alleged.

That is the situation Judge Hall encountered in *Musco Propane, LLP v. Town of Wolcott*, No. 3:10-cv-1400 (JCH), 2011 WL 3267756 (D.Conn. July 28, 2011), in which she reasoned that the chronology of events the plaintiff described did not support a plausible inference of retaliatory intent. Judge Hall said:

> An inference of retaliatory intent would be unsupported if the PZC

> directed the ZEO to take action before Musco appealed on February 26, 2010 or, if earlier, indicated its intent to do so.  Without support for the view that the Cease and Desist was retaliatory, the *other subsequent actions* taken by the Town authorities – *i.e.*, the denial of the 10K Tanks Application and the ZBA's affirmation of the Cease and Desist – appear to be *part of a continuing series of zoning decisions that began before Musco's first appeal.*

2011 WL 3267756, at *9 (emphases added).

Judge Karas encountered a similar situation in *Schubert v. City of Rye*, 775 F.Supp.2d 689 (S.D.N.Y. 2011).  Plaintiffs (the Schuberts) complained that an adjoining landowner (Gates) was allowed by City of Rye officials to correct a drainage condition on his property.  Gates's corrective work had the effect of drying up plaintiffs' previously established Wetlands Project on the Schuberts' property.  Plaintiffs sued the City, alleging that its city engineer wrongfully permitted Gates to do the requested work without first requiring a mandated inspection by the City Naturalist, and that the City wrongfully allowed the work to proceed on the Gates property, to the Schuberts' detriment.  The City engineer's work permission to Gates antedated the Schuberts' first complaint to the City.  In all these respects, the facts in *Schubert* resemble those in the case at bar.  Plaintiffs in *Schubert* asserted claims against the City for constitutional substantive and procedural due process violations, and a retaliation claim based upon the City's "refusal to provide redress for the wrongful decision not to require a permit for the work done on the Gates property."  775 F.Supp.2d at 710.  Judge Karas dismissed the retaliation claim.  His reasoning is closely applicable to the case at bar, and so I quote it at some length:

> Here, Plaintiffs have alleged that their property has been damaged by Defendants' alleged retaliatory failure to enforce local land-use regulations and correct the damage which resulted from Mottarella's initial determination that the work on the Gates property did not

23

require a permit.[5] . . . What remains, then, is whether Plaintiffs have plausibly alleged that Defendants' conduct was substantially caused by Plaintiffs' exercise of that [First Amendment] right. . . . Plaintiffs' allegations here make clear that the allegedly improper work on the Gates property took place well before Plaintiffs made any complaints to Defendants. . . . [[I]t is clear that the work and the allegedly corresponding damage to Plaintiffs' property had occurred by the time Plaintiffs claim they lodged their objections about the work (and Mottarella's decision to allow it to go forward without a permit) with Defendants. . . . At most, Plaintiffs are merely alleging that their complaints to somehow undo the Gates work were ignored by Defendants.  Yet, the City of Rye was not obligated to act upon Plaintiffs' requests for redress.  And, no reading of *Gagliardi*[6] suggests that a disgruntled plaintiff has a viable retaliation claim merely because a government official declines to remedy every wrong identified by the plaintiff. . . . Not a single fact is alleged that plausibly supports an inference of retaliatory motive that can be drawn from Defendants' decision not to accede to Plaintiff's request, rendering those boilerplate allegations insufficient, particularly post-*Twombly* and *Iqbal*.

775 F.Supp.2d at 711-714 (citations and internal quotation marks omitted).

I revert to the list of the Town Defendants' "bad acts" appearing on pages 2 and 3 of Plaintiffs' brief, Doc. 78.   Those charges, when stripped of most if not all their conclusory averments, come down to this:

• The Town refused to enforce allegedly non-discretionary regulations after the Reardons submitted a detailed engineering report (with the September 29, 2010 complaint) itemizing more than eight alleged zoning violations in the Eckert construction plans.

---

[5]  City engineer Mottarella in *Schubert* is the functional counterpart of Town Zoning Enforcement Officer Keating in the case at bar.

[6]  Judge Karas's reference is to the Second Circuit's opinion in *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994), upon which Plaintiffs at bar place a primary reliance.

- Town officials engaged in a concerted effort to obstruct, conceal and hinder the Reardons' ability to exercise their First Amendment rights and prosecute an appeal to the Zoning Board of Appeals.

- Defendant Keating refused to execute his alleged duties to retract the Eckert permits, and further refused to carry out his alleged mandatory duty to stay all construction on the Eckert Property pending the outcome of the Reardons' eventual appeal.

- Keating, Ginsberg and the Eckerts colluded among themselves to allow the allegedly unlawful project to go forward and thwart the Reardons' appeal.

At page 4 of their brief, Plaintiffs sum up these acts by saying:

> The result of this pattern of disregard of nondiscretionary legal duties – in essence, a free pass to the Eckerts – was that the latter moved into their house even though a ZBA appeal, a state superior court case, and this case were pending. Their transparent strategic goal, facilitated by Keating's intentional dereliction of duty, was to complete their construction, move in and moot the Reardons' First Amendment challenges.

Doc. 78, p. 4. That passage may be regarded as the Overture containing the dominant themes of the Opera whose score immediately follows. The Town Defendants' conduct might or might not support due process and equal protection claims; indeed, the Reardons devote most of their brief to those claims, and the Court considers them *infra*. But there is no hint in this summary of an intent by the Town Defendants to *retaliate* against the Reardons for having exercised their First Amendment right to petition. The same as the plaintiffs in *Musco* and *Schubert*, the Reardons in the case at bar are really complaining about municipal officials' failure or refusal to agree with the Reardons' interpretations of pertinent land-use statutes and regulations, or to redress perceived

wrongs inflicted on them.  The SAC's references to retaliation are conclusory boilerplate, without foundation or support in the SAC's factual allegations from which an intent to retaliate could plausibly be inferred.  On the contrary: the more plausible inference that can be drawn from the SAC's allegations is that the Town Defendants, for some unpleaded motive, decided to favor the Eckerts and disadvantage the Reardons.  While that would not be an honorable or proper motive for the Town to indulge, the point here is that the Town Defendants could wish to favor the Eckerts in all things, without fostering any intent to retaliate against the Reardons for anything.

If one is to weigh the scales of plausibility, it is inherently implausible to suppose that Mr. Kaufman's lawyerly letter of September 29, 2010 to Messrs. Ginsberg and Saverine, together with Mr. Kellard's calmly phrased engineering report, so outraged and inflamed the entire administration of the Town of Darien that a collusive conspiracy was promptly formed to deprive the Reardons of their rights.

I conclude that the SAC does not sufficiently allege a claim on behalf of the Reardons that the Town Defendants retaliated against the Reardons for exercising their First Amendment right of petition.  The two Second Circuit cases cited *supra* do not require a contrary conclusion.  In *Dougherty*, 282 F.3d 83, the town defendants granted plaintiff landowner a permit to make substantial renovations to his bungalow unit, and then abruptly revoked the permit when plaintiff moved for attorney's fees as the prevailing party in related litigation with the town.  Plaintiff alleged that the town's permit was revoked in retaliation for his litigation stance, and also alleged "that the entire chronology of events spanning a period of over five years displays a general pattern of egregious treatment by the Board."  282 F.3d at 92.  The Second Circuit concluded that plaintiff's complaint "adequately sets forth facts, which if proven, can support a finding of retaliatory motive."

26

*Id.*

*Dougherty* furnishes no guidance in the case at bar. The use of the *Dougherty* plaintiff's own property, the town's revocation of a permit for that property issued to plaintiff, and an alleged course of treatment by the town of plaintiff as property owner over five years were all pleaded and at issue. In the case at bar, the Reardons do not complain of any Town Defendants' conduct concerning regulation of, or treatment of them or the property they own. The Reardons' retaliation claim is based solely on the complaint letter they sent to the Town on September 29, 2010 about the Eckert property, and alleged conduct on the part of Town Defendants subsequent to that date. For the reasons stated, those allegations are insufficient to plead a retaliation claim.

In *Gagliardi*, 18 F.3d 188, the Gagliardi plaintiffs' residentially zoned property was adjacent to the Lumelite Corporation's industrially zoned property, a plastics factory. These adjoining neighbors, the residential Gagliardis and the industrial Lumelite, did not dwell together in harmony. The Gagliardis purchased their residential building in the defendant Town of Pawling in 1975. A contentious three-party struggle (Gagliardis, Lumelite, and the Town of Pawling) broke out six years later and went on for a decade more. The Gagliardis repeatedly complained to Town officials that Lumelite's industrial operations were violating land-use regulations and restrictions. Eventually the Gagliardis sued the Town and Lumelite for violating their constitutional rights. The Second Circuit summarized the allegations of the Gagliardis' complaint as follows:

> The Gagliardis specifically have pleaded that the Municipal Defendants "undertook a purposeful aggravated and persistent course of conspiratorial noncompliance and nonenforcement of the pertinent municipal, zoning, noise and safety ordinances, rules, regulations, and laws" in "response" to the Gagliardis' efforts to remedy Lumelite's violations and that the Municipal Defendants have undertaken "a long series of purposeful, retaliatory and conspiratorial actions . . . in

27

> violation of [the Gagliardis'] constitutional civil rights."  Moreover,
> the Gagliardis began exercising their First Amendment rights in 1981
> when Lumelite allegedly began violating the Code, and, according to
> the complaint, the Municipal Defendants continually failed to enforce
> the Code against Lumelite, failed to enforce the noise ordinance after
> its enactment in 1985, granted the permit, site plan and height
> variance for the silos in 1985 and 1986, and approved the property
> swap in 1990.

18 F.3d at 195.  I need not recount the details of those underlying disputes for the sake of present

analysis.  The Second Circuit concluded:

> These detailed allegations provide a chronology of events from which
> an inference can be drawn that actions taken by the Municipal
> Defendants were motivated by or substantially caused by the
> Gagliardis' exercise of their First Amendment rights.  Therefore, the
> cause of action for retaliation pleaded in the complaint is sufficient to
> survive the Municipal Defendants' motion to dismiss.

*Id*.[7]

Given the circumstances in *Gagliardi*, one cannot quarrel with the Second Circuit's

conclusion (I cannot quarrel with that court in any event).  But there is no meaningful resemblance

between the *Gagliardi* plaintiffs' many specific and detailed factual allegations of municipal conduct

over ten years, and the Reardons' conclusory allegations of municipal conduct compressed within

one year (March 2010 to March 2011).   The Second Circuit regarded the allegations in *Gagliardi*

as sufficient to support an inference of retaliatory intent on the part of the Town of Pawling.  For the

reasons previously stated, the Reardons' allegations in the case at bar are insufficient to support that

inference on the part of the Town of Darien.  In consequence, the Defendants' motion to dismiss

Plaintiffs' Petition Clause claim will be granted.

---

[7]   The court of appeals affirmed the district court's dismissal of the Gagliardis' due
process, equal protection and conspiracy claims.  Those aspects of the case are considered in Part
II.B.2., *infra*.

2.    *Due Process*

Plaintiffs' Second Amended Complaint asserts claims for violations of procedural and substantive due process rights.  As their brief acknowledges, these concepts pose a common inquiry: "Have the plaintiffs alleged that they have been deprived of a constitutionally protected interest?" Doc. 78, p. 35.  Plaintiffs accurately summarize the law of this Circuit.  "For appellants to establish a procedural due process violation, they must: (1) identify a property right, (2) establish that governmental action with respect to that property right amounted to a deprivation, and (3) demonstrate that the deprivation occurred without due process." *Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir. 1989), *cert. denied*, 496 U.S. 941 (1990).  "To state a substantive due process claim, a party must *first* establish that he had a valid property interest in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (emphasis in original).

Accordingly, it is important to discern from the SAC precisely what property right or property interest Plaintiffs identify as having been subjected by government action to a deprivation.  That task is complicated by the pleading's lengthy, frequently argumentative 215 paragraphs of allegations, and by the limitations in the "WHEREFORE" prayers for relief to declaratory or injunctive remedies. But one prayer states: "As there is no adequate remedy at law, a judgment directing the Eckert defendants to dismantle all construction undertaken in violation" of state and town statutes and regulations. Doc. 64 (SAC), p. 43 (¶ 5.D). That request to tear down the Eckerts' newly expanded house identifies by implication the property right of which the Reardons conceive themselves as having been deprived: the Reardon Property's enhanced value bestowed by its previously unobstructed view of Long Island Sound.  Consistent with that identification of right, ¶ 174 of the

29

SAC alleges that the Town Defendants' conduct reduced the Reardons' opportunities for the exercise of their First Amendment rights and the protection of private "property values." *Id.*, p. 33(¶ 174). Paragraph 182 alleges that the Town Defendants' conduct "has damaged the Reardon property in an amount exceeding $1,000,000 and deprived them of the equal protection of the laws." *Id.*, p. 35 (¶ 182). The only conceivable diminution in value of or damage to the *Reardon Property* ascribable to the events alleged in the SAC is the partial obstruction of the Reardon's water views caused by the construction on the *Eckert Property*.

This brings the Plaintiffs hard up against the Second Circuit's decision in *Fusco v. State of Connecticut*, 815 F.2d 201 (2d Cir. 1987), *cert. denied*, 484 U.S. 849 (1987). The plaintiff Fuscos, husband and wife, owned and occupied a parcel of land improved with a home in Trumbull, Connecticut. Their immediately adjacent neighbors were the Fennells, husband and wife. The Fennells applied to the Trumbull Zoning and Planning Commission for and received permission to divide their property into two building lots, one of which would be the site of the Fennells' existing home and the other of which, bordering on the Fuscos' property, would be available for sale. Eventually the Fennells contracted to sell this newly created building lot to one D'Amato. "D'Amato planned to build a house on the lot in such a location as would, according to [the Fuscos], destroy their privacy and diminish the value of their property." 815 F.2d at 204. The Fuscos opposed D'Amato's application to the Zoning Board of Appeals for a variance on the sideyard requirement of local regulations. The ZBA denied D'Amato's application, but according to the Fuscos, D'Amato subsequently stated his intention "to build a smaller home, which [would] require no sideyard variance, very close to [the Fuscos'] swimming pool." *Id*.

The Fuscos brought a § 1983 action in federal district court against the state, the town, certain

town officals, and D'Amato, asserting a deprivation of property without due process of law.  The due process claim focused upon allegedly unconstitutional provisions in a Connecticut statute relating to notices of hearings pending before zoning commissions or zoning boards.  The Fuscos sought a preliminary injunction restraining the town defendants and D'Amato "from effectuating the subdivision and variance obtained by the Fennells and from issuing a building permit allowing construction of a house on the lot D'Amato agreed to purchase." *Id.*  Chief District Judge Daly heard the case, denied the injunction, and granted defendants' motion to dismiss the action.  The Fuscos appealed.  The Second Circuit affirmed.[8]

The court of appeals noted that, at the oral argument in the district court "on plaintiffs' motion for a preliminary injunction, the Fuscos were pressed to identify the property rights allegedly deprived by the defendants." *Id.* at 205.  In partial response, "the Fuscos argued that if defendants were not restrained, the value of plaintiffs' real estate would be diminished, and they would be injured in the enjoyment of their home and surrounding land." *Id.*  The Second Circuit categorically rejected that constitutional theory:

> Plaintiffs' second claim – that the value of their real property will decline absent relief – fares no better.  Assuming the truth of the claim, the Fuscos have failed to allege a *deprivation* cognizable under the fourteenth amendment.  As we held in *BAM Historic District* [*Ass'n v. Koch,* 723 F.2d 233, 236-37 (2d Cir.1983)], "[g]overnmental action [allegedly causing a decline in property values] has never been held to 'deprive' a person of property within the meaning of the Fourteenth Amendment." *Id.* at 237.

815 F.2d at 206 (emphasis in original).

The case cited in this passage from *Fusco* is *BAM Historic District v. Koch*, 723 F.2d 233

---

[8]  I have stated the facts in *Fusco* at some length because, as the careful reader will have noted, they bear a marked resemblance to those in the case at bar.

(2d Cir. 1983), where residents of an urban community brought suit against the city's mayor and commissioner of social services, challenging the city's operation of a shelter for homeless men. The Second Circuit held that the plaintiffs' "due process claim fails because there has been no deprivation of plaintiffs' property interest. . . in preventing the location of a shelter for the homeless in their neighborhood." 723 F.2d at 237. The court reasoned:

> Plaintiffs are not claiming that their property has been taken or their use of it so drastically regulated as to destroy its value. Their complaint is that the City's operation of the shelter in the vicinity of their property will cause a decline in property values.

*Id.* (citations omitted).

It is the decline in property values, caused by the unwelcome presence of a homeless shelter in a presumably more upscale neighborhood , that the Second Circuit held in *BAM* failed to state a Fourteenth Amendment claim for deprivation of a property interest. It is the decline in property values, caused by the unwelcome construction of an adjoining residence close to the Fuscos' swimming pool, that the Second Circuit held in *Fusco* failed to state a Fourteenth Amendment claim for deprivation of a property interest. How then is a district judge sitting in the Second Circuit to evaluate the constitutional viability of the Reardons' claim that the Eckerts' construction of a larger house on the Eckert property has caused a decline in the value of the Reardons' property?

Plaintiffs observe in their brief that *Fusco* and other cases cited by Defendants were decided before the Supreme Court decided *Connecticut v. Doehr*, 501 U.S. 1 (1991). Plaintiffs put it this way: "the rather cursory *Fusco* decision was decided four years prior to the Supreme Court's decision in *Doehr*." Doc. 78, p. 32. "Cursory" is an advocate's subjective and pejorative word: If an appellate decision contrary to your position is stated succinctly and with economy of phrase, dismiss it as

32

*cursory*. By that token, if one contrasts Justice Holmes's opinions with a latter-day Supreme Court decision such as *Citizens United*, Holmes would be devalued as the shallow author of cursory decisions.

Plaintiffs' sense of history is impeccable: the Second Circuit decided *Fusco* in 1987 and the Supreme Court decided *Doehr* in 1991. But the jurisprudential significance of this chronology is illusive. Plaintiffs' argument must be that the Supreme's Court's *Doehr* decision contradicts the Second Circuit's *Fusco* decision; or to state the proposition somewhat differently, if the Supreme Court had decided *Doehr* before the Second Circuit decided *Fusco*, the Second Circuit would have decided *Fusco* differently. Neither proposition follows. In *Doehr*, the petitioner's real property was attached by an individual suing him in a Connecticut court, pursuant to a Connecticut prejudgment remedy statute. Justice White stated the case as follows:

> This case requires us to determine whether a state statute that authorizes prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond, satisfies the Due Process Clause of the Fourteenth Amendment.

501 U.S. at 4. Not surprisingly, the Court answered that question in the negative. The principal factor in the Court's reasoning was the multitude of direct adverse consequences that attachment imposed upon the petitioner's interests in his property. In that regard, the Court said:

> We agree with the Court of Appeals that the property interests that attachment affects are significant. For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause.

*Id.* at 11. There is no meaningful resemblance between the deprivation of property interests such as

33

these, which the Supreme Court held in *Doehr* implicated the Due Process Clause, and a property owner's interest in preserving the value of his property in response to a neighbor's construction of a house on adjoining land, which the Second Circuit held in *Fusco* did not implicate the Clause.  I see no reason to suppose that if the Supreme Court had decided *Doehr* in, let us say, 1986, the Second Circuit would have decided *Fusco* any differently in 1987.

Plaintiffs say in their brief at 33 that other courts "have confined *Fusco's* application to the particular facts of *Fusco*," apparently in an effort to diminish *Fusco*'s precedential value.  Cases from an Oklahoma state court and a federal Middle District of Pennsylvania are cited as illustrative. Judges in such far-off lands may be free to disregard or disagree with a Second Circuit holding.  I am not.  Plaintiffs also cite a New York trial court decision, *U.S. Trust Co. v. Ramapo*, 645 N.Y.S.2d 396 (N.Y. Sup. Ct. 1996), and say of it that the court "refused to apply *Fusco* where the zoning board had provided only constructive notice that it had approved the demolition of the property for which the plaintiff was the mortgagee."  It is puzzling that Plaintiffs discern any support for their position in *Ramapo*, a decision which contains these passages:

> The variance was granted, a demolition permit was issued, the one-family house demolished, and construction begun on the house of worship.  It is plaintiff's contention that the Town's method of giving notice was insufficient to provide notice to a mortgagee, and its security interest in the property was severely impaired.

> \*          \*          \*          \*

> Nevertheless, the demolition of the entire building on the property is not akin to a mere decline in property value, which would not support a Fourteenth Amendment deprivation claim (*see, e.g., Fusco v. State of Conn.*, 815 F.2d 201), but constitutes a very substantial impairment of plaintiff's security interest.

645 N.Y.S.2d at 397, 398.  *Ramapo* might be a precedent in the Reardons' favor if the Town of

34

Darien's conduct resulted in the demolition of *their* house (which fortunately did not occur).  On the contrary, *Ramapo* supports Defendants in the case at bar because the New York judge cited *Fusco* for the proposition that "a mere decline in property value" does "not support a Fourteenth Amendment deprivation claim," thereby demonstrating the continued force of *Fusco* as precedent on the question central to the case between the Reardons, the Town of Darien, and the Eckerts.

Notwithstanding the Plaintiffs' suggestions that the Second Circuit's decision in *Fusco* is no longer good law, the court of appeals has never overruled or questioned it, and continues to cite *Fusco* as authority for one or another of its points of decision.  *See, e.g., New York State National Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001) ("The opportunity granted abutting landowners and aggrieved persons to appeal decisions of planning and zoning commissions and zoning boards of appeal is purely procedural and does not give rise to an independent interest protected by the [F]ourteenth [A]mendment.").  This Court is bound by *Fusco*, whose reasoning and square holding preclude the present Plaintiffs' due process claims.

As an additional basis for a constitutionally protected interest, Plaintiffs argue in their brief at 30: "The answer to the diminished value question – under Connecticut law – is found in a line of [Connecticut] cases" that the brief proceeds to cite and discuss.  It is of course true that in determining whether the Plaintiffs state a cognizable due process claim under the Fourteenth Amendment, I am required in this federal court to consider Connecticut statutes, Darien regulations, and Connecticut court decisions construing such enactments.[9]  "The benefit or property interest

---

[9]  The  Fourteenth Amendment  to the United States Constitution states, in pertinent part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourth Amendment was incorporated and applied to the states

which triggers federal constitutional protection is derived from independent sources, such as state law." *Schubert,* 775 F.Supp.2d at 706 (citations omitted).  "Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

However, for  constitutional purposes this is a limited concept: "the mere violation of a state law does not automatically give rise to a violation of federal constitutional rights." *Zahra v. Town of Southold*, 48 F.3d 674, 682 (2d Cir. 1995).  In *Roth* the Supreme Court expanded upon that theme: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  408 U.S. at 577.  The Second Circuit's analysis of this factor "focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision," a standard which "appropriately balances the need for local autonomy, with recognition of constitutional protection *at the very outer margins of municipal behavior*." *Zahra*, 48 F.3d at 680 (emphasis added).  In the Second Circuit's view, that approach to land-use regulation cases, such as the instant one,

> represents an acknowledgment that decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government – not by federal courts.  It also recognizes that the Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state

through the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655(1961).

courts.

*Id*.

Applying these settled principles to the case at bar, it seems to me clear that in order to state a viable claim for a Fourteenth Amendment due process violation, the Plaintiffs must adequately plead that Connecticut law gave them a legitimate claim of entitlement to the interest they sue to protect, namely: the Reardons' interest in preventing the Eckerts' enlarged house from diminishing the value of the Reardon Property by partially obstructing the Reardons' water views. Since the Eckerts' larger house has now been built, the Reardons must have an equally clear entitlement to a federal court order compelling the Eckerts to tear it down. Indeed, that is one of the forms of relief prayed for in the SAC.

Plaintiffs' Second Amended Complaint and brief begin the discussion of Connecticut law with an invocation of the Connecticut Coastal Management Act, Conn. Gen. Stat. §§ 22a-90 to 22a-112 ("CCMA"). The Legislature adopted the CCMA in order to permit Connecticut to obtain financial and legal advantages offered by the federal government to states that comply with the Federal Coastal Zone Management Act of 1972, 16 U.S.C. § 1451. The CCMA applies to a Connecticut "coastal area" which is defined by a "coastal boundary which shall be a continuous line delineated on the landward side by . . . a one thousand foot linear setback from the mean high water mark in coastal waters . . . " Conn. Gen. Stat. § 22a-94(b). The statute sets detailed policies and provisions for the regulation and preservation of the coastal area. The Town of Darien is one of the coastal municipalities whose "land and water" are included in the state coastal area. *Id.* § 22a-94(a). The CCMA provides: "In order to carry out the policies and provisions of this chapter and to provide more specific guidance to coastal area property owners and developers, coastal municipalities may

37

adopt a municipal coastal program for the area within the coastal boundary and landward of the mean high water mark." *Id.* § 22a-101(a).

Darien availed itself of that statutory option by enacting Section 810 of the Town of Darien Zoning Regulations ("DZR").  Section 811 of the DZR provides that the purpose of the Section is to "achieve the goals, objectives and policies" of the CCMA.  Darien, Connecticut, Zoning Regulations § 811.  Section 813, captioned "Review Procedure," provides in pertinent part:

> All buildings, uses and structures fully or partially within the Coastal Boundary shall be subject to the Coastal Site Plan Review requirements and procedures set forth in "The Coastal Management Act" and also with the requirements of the Darien Zoning Regulations, with the exception of gardening, grazing and the harvesting of crops.  The following activities beyond 100 feet of the mean high tide line shall be exempted from the coastal plan review requirements of "The Coastal Management Act" in all such instances where no potential adverse impacts can be determined.

> 813.1   Exempt Activities

> > a.   Additions to, or modification of, existing buildings or detached accessory buildings, such as garages and utility sheds.

*Id.* §§ 813 to 813.1.[10]

With respect to this statutory and regulatory scheme, the Plaintiffs say in their brief [Doc. 78] at 8 n. 9, without subsequent contradiction by Defendants: "The coastal boundary is 1000' from the high water mark.  The entirety of the Eckert project is within that boundary. All projects within the boundary must undergo full Coastal Site Plan Review *unless* they qualify for an exemption.  In other words, any construction within the coastal boundary requires the equivalent of a special permit or

---

[10]   The pertinent "Zoning Regulations of the Town of Darien, Connecticut," adopted on May 25, 1999,  appear in the pleadings of this case at Doc. 78-1.

exception, and no permit is issued as a matter of right."

A principal contention by Plaintiffs is based upon the provision in DZR § 813 that an exemption from CCMA site plan review requirements can be granted by the Town "in all such instances *where no potential adverse impacts can be determined*." *Id.* § 813 (emphasis added). Plaintiffs say that their examination of the Town files reveals that, with respect to the Eckerts' substantial addition to their existing building, no written or other indication exists to show that responsible Town officials made an inspection and in fact determined that the project would have "no potential adverse impacts." In consequence, the Plaintiffs contend that the Town Defendants failed to perform a mandatory duty, and that the building permits Keating issued to the Eckerts were and remain null and void.

In those circumstances, Plaintiffs' counsel sent his letter of September 29, 2010 to Town officials, demanding that the Eckerts' project be submitted to a full Coastal Site Plan Review. When the Town did not respond, and no review was conducted, Plaintiffs filed their November 10, 2010 appeal with the ZBA. That filing triggered what Plaintiffs perceive to be a second disregard by the Town of a mandatory duty. Conn. Gen Stat. § 8-7 regulates appeals to local zoning boards of appeals. It provides in part that, with the exception of a zoning officer's "order, requirement or decision which prohibits further construction or expansion of a use in violation of such zoning regulations,"

> An appeal from any other order, requirement or decision *shall stay all proceedings in the action appealed from* unless the zoning commission or the officer from whom the appeal has been taken certifies to the zoning board of appeals after the notice of appeal has been filed that by reason of facts stated in the certificate a stay would cause imminent peril to life or property. . .

Conn. Gen. Stat. § 8-7 (emphasis added).  Plaintiffs contend that this provision required the Town Defendants to stay all continuing construction on the Eckert Property, and their failure to do so constituted a second  breach of a mandatory duty.

These are arguable propositions on behalf of the Reardons, and counsel argues them in spirited fashion.  But the question is whether Connecticut law clearly entitles the Reardons to protect their interest in preserving *their* property's value by means of a court order compelling the Eckerts to demolish a house on *theirs*.  That proposition seems problematic, with respect to both allegedly mandatory duties that Plaintiffs say Darien disregarded.

First, as to the Coastal Site Review Plan requirement: in *Bryan v. Branford Planning & Zoning Comm'n*, 22 Conn. L. Rptr. 213, 1998 WL 294057 (Conn.Super. May 20, 1998), the Superior Court heard an appeal from a decision by the Branford Zoning Commission to grant the application of a building owner for a special exception permitting him to construct a larger two-story building on waterfront property known as "Dutch Wharf."  That application was opposed by plaintiff, the owner of another property which abutted the subject property.  The court (Downey, *J.*) described the "crucial issue" as "the impact on the plaintiff's water view of the construction of the proposed building on the location selected by the applicant." 1998 WL 294057, at *7.  The Town of Branford, like Darien, had enacted zoning regulations intended to adopt the provisions of the CCMA, particularly one prohibiting "an adverse impact on coastal resources."  *Id.*, at *5.  As in the case at bar, the zoning officer in Branford had not made a finding that the applicant's proposed new building had "no adverse impact."  Plaintiff contended that the absence of that finding invalidated the Commission's approval of the application, since "plaintiff presented unambiguous and uncontroverted testimony that her scenic view would be severely and adversely impacted by the

40

proposed development." *Id*. Judge Downey rejected that argument. He held that the Commission was entitled to rely upon an opinion expressed by the Connecticut Department of Environmental Protection, "a state agency with greater experience and competence in the field," that "the 'coastal resource' at issue is the applicant's property, and that plaintiff's view across that property is not a coastal resource as defined by General Statutes § 22a-93 [the CCMA]." 1998 WL 294057, at *5 -*6.

The Reardons do not agree with this reading of *Bryan*, since if one grants the quoted premise, even if Darien zoning officer Keating had subjected the Eckerts' proposed construction to CCMA review, he could have concluded with equal facility that the Reardons' view across the Eckerts' property was not a "coastal resource" under the statute, and consequently not entitled to statutory protection. Plaintiffs' brief cites and discusses at 44-45 another Superior Court case, *Fromer v. Lombardi*, No. CV91-0518691, 1992 WL 231185 (Conn. Super. Sept. 14, 1992) (Koletsky, *J.*), a coastal site case where it appears from the opinion that the zoning commission received, over the applicant's objections, and considered an opponent's evidence that he owned "property across the street from the subject property" and "public access to the view . . . would be obstructed by defendant's construction of his proposed house on his property." 1992 WL 231185, at *6.

Plaintiffs also cite a number of Connecticut decisions holding that, in the particular circumstances of the case, diminished property value gives rise to an aggrievement entitling a landowner to appeal a zoning decision. Doc. 78 , p. 28-32. The leading case is said to be *Puskarz v. Zoning Bd. of Appeals of Hartford*, 155 Conn. 360, 365-366 (1967), where the zoning officials granted a variance to allow a 120-bed convalescent home with parking spaces for 52 cars to be built in a residential zone, across the street from plaintiffs' residence. The Supreme Court said: "The [trial] court's conclusion that the plaintiffs are aggrieved parties because of the depreciation in value

41

of their property which would result from the construction of a convalescent home, and the increased traffic incident thereto, is amply supported by the evidence." In *Esposito v. Hamden Planning and Zoning Comm'n*, No. CV-99-04225249, 1999 Conn. Super. LEXIS 2344, at *2 (Conn. Super. Aug. 27, 1999), also cited by Plaintiffs, the superior court cited *Puskarz* for the proposition that "a depreciation in property values, if supported by the evidence, may confer standing to appeal."

These Connecticut cases fall well short of establishing that Connecticut law vests the Reardons with a clear entitlement to the relief they seek in this federal court, where they must plausibly allege the existence of a federally protected property right. The most that can be said for the state cases Plaintiffs rely upon is that they may introduce a note of uncertainty into *Bryant*'s holding that the coastal statute and regulations do not apply to the diminished value of an adjacent owner's property caused by construction blocking his water views. But that is not sufficient to create a federally protectable property interest. The Second Circuit expanded on that point in *Natale v. Town of Ridgefield*, 170 F.3d 258 (2d Cir. 1999), where the plaintiff claimed that a state official's denial of a permit violated the standards of substantive due process. Reversing the district court and directing entry of judgment for the defendants, the Second Circuit pointed out that plaintiff "first must establish that he has a federally protected right in the permit," and went on to say:

> This requires a demonstration that he had a clear entitlement to the permit under state law. Usually, entitlement turns on whether the issuing authority lacks discretion to deny the permit, *i.e.*, is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met. There is no reason, however, to restrict the "uncertainty" that will preclude existence of a federally protectable property interest to the uncertainty that inheres in an exercise of discretion. *Uncertainty as to the meaning of applicable law also suffices.* Indeed, if uncertainty as to the law did not preclude recognition of a federally protectable property interest, permit claimants would regularly be entitled to present to federal courts their

42

> disputes concerning the interpretation of local and state land use
> regulations. Just as federal courts are not to be turned into zoning
> boards of appeals, they are also not to be substituted for state courts
> as adjudicators of the meaning of zoning and other land use
> regulations.

170 F.3d at 263 (citations and footnote omitted) (emphasis added). The Second Circuit has also said,

more succinctly: "An arguable claim of entitlement is not a 'legitimate claim of entitlement.'"

*Landmark Dev. Group, LLC v. Town of East Lyme*, 374 F. App'x 58, 60, 2010 WL 786882, at *1

(2d Cir. March 10, 2010).

The case at bar is a quintessential example of the kind that should be submitted to state

courts. The courts of the State of Connecticut should be the "adjudicators of the meaning of zoning

and other land use regulations" that are found in the Connecticut Coastal Management Act and the

Darien Zoning Regulations, and govern the rights and obligations of the Reardons, the Eckerts, and

the Town. At some level, the Reardons acknowledge that: they appealed the Darien ZBA's adverse

Resolution to the Superior Court, and now await a ruling by the Connecticut Supreme Court which,

if favorable to the Reardons, will require the Town zoning officials to begin all over again with the

Eckerts' applications.

Quite apart from these considerations, the Plaintiffs miss the mark when they charge that the

Town Defendants breached, to Plaintiffs' detriment, a *mandatory* duty arising out of the CCMA and

the DZR. Assuming without deciding that the state statute and the town regulations interacted in

such a way as to require Zoning Enforcement Officer Keating to conduct a coastal site inspection

of the Eckert Property before issuing building permits for the new construction on that property,

§§ 813 and 813.1 of the DZR empowered the Town Defendants to exempt the "additions to" the

Eckerts' "existing building[]" if, in the judgment of the zoning officials, "no potential adverse

43

impacts can be determined."  These provisions vested in the Town officials discretion to grant or

deny the Eckerts' requests for building permits, and under the cited cases preclude the Reardons from

claiming a federally protectable property interest of their own.

Plaintiffs' brief advances the "mandatory duty" theory in an effort to distinguish such Second

Circuit cases as *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994), but the effort fails, and

the holding in *Gagliardi* applies to the case at bar.  In *Gagliardi,* the owners of property adjacent to

a plastics factory asserted a due process claim arising out of "certain positive actions taken by the

Municipal Defendants, namely, the approval of a height variance and  site plan and the issuance of

a building permit to allow Lumelite to erect the two storage silos, and the granting of the zoning

variances that facilitated the property swap between Lumelite and the Guild."  18 F.3d at 192.  That

due process claim failed to pass constitutional muster, for the reasons the Second Circuit then

explained:

> Our review of the relevant provisions of the Code . . . indicates that
> the Municipal Defendants had broad discretion in determining
> whether to grant or deny the building permit, site plan and variances.
> Accordingly, the grant to Lumelite and the Guild of the permit, site
> plan and variances did not infringe upon any protected property
> interest of the Gagliardis.

*Id.* at 192-193 (citations omitted).  So too, in the case at bar.  Under the DZR, Town zoning officials

had the discretion to determine whether or not the Eckerts' proposed construction did or did not

create "potential adverse impacts" upon others; it follows that the officials had the discretion to grant

or deny building permits to the Eckerts; and it follows with equal necessity that Keating's issuance

of those permits did not infringe upon any protected property interest of the Reardons.[11]  *Compare,*

---

[11]  Had Keating  conducted  a  coastal  site inspection, and issued a written finding of "no
potential  adverse  impact"  before  issuing  building permits  to  the  Eckerts,  and  the  Reardons

*e.g.,  RR Village Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1201-02 (2d Cir. 1987) ("if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection.")

Lastly, Plaintiffs' multiple complaints about the manner in which the Town Defendants conducted zoning procedures relevant to the Eckert Property do not give rise to a viable constitutional claim.  The Reardons complain, *inter alia*, that the Town Defendants should have given them notice of the Eckerts' application in March 2010 for building permits, given the Reardons' prior verbal expressions of concern to Town officials on that subject.  They also complain that they missed the notice of the Eckerts' application printed in a local newspaper, which is averred to be of insufficiently public dissemination.  The latter circumstance resulted in the Reardons' failure to file a timely appeal  of the Eckerts' building permits, which in its ultimate Resolution the ZBA gave as the first of two reasons for denying the appeal.  This case resembles  *Fusco,* 815 F.2d 201, where the adjoining property owners complained that their due process rights were violated by inadequate provisions for notifying them of their neighbor's zoning applications.  The Second Circuit rejected that claim in *Fusco*, holding that: "The opportunity granted abutting landowners and aggrieved persons to appeal decisions of planning and zoning commissions and zoning boards of appeal is purely procedural and does not give rise to an independent interest protected by the

---

discovered that finding in the Town files, one may safely assume that the Reardons would not have agreed with it.  In these hypothetical circumstances, the Reardons' remedy would be to challenge the finding as arbitrary or an abuse of discretion.  That is a recognized state law remedy.  *See Bryan*, *supra*.  The federal Constitution would not be implicated, in the absence of a federally protected right.  *See Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) ("Because we find that Crowley had no property interest in a new or existing parking variance, we need not decide whether the Zoning Board acted in an arbitrary or irrational manner, by denying him such relief.") (citation and internal quotation marks omitted).

fourteenth amendment."  815 F.2d at 205-06.

That is so, even in a case where municipal authorities violate local procedural zoning laws. As authority for the quoted proposition, the *Fusco* court cited *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58 (2d Cir. 1985), where the plaintiff, denied a certificate of location approval for his automobile junkyard within the City of West Haven, alleged corruption, collusion and conspiracy just as unseemly as that alleged by the Plaintiffs in this case.  Judge Dorsey dismissed the plaintiff's federal constitutional claims.  The Second Circuit affirmed.  Judge Mansfield wrote for the court of appeals:

> Even assuming, as we must, that defendants engaged in egregious and politically-influenced procedural irregularities, the threshold question is whether plaintiffs' interest in obtaining ZBA approval of their application was one entitled to protection and enforcement by a federal court, which is a tribunal of limited jurisdiction.  Section 1983, upon which plaintiffs depend, does not guarantee a person the right to bring a federal suit for denial of due process in every proceeding in which he is denied a license or a permit. . . . [T]he mere existence of reasonable procedures entitling a person to a hearing under state law does not give rise to an independent substantive liberty interest protected by the Fourteenth Amendment.

> In deciding whether an applicant for a license or certificate of approval has presented a legitimate claim of entitlement under state law or merely a unilateral hope or expectation, we must bear in mind that the mere violation of a state statute does not automatically give rise to a violation of federal Constitutional rights.  Indeed, even an outright violation of state law in the denial of a license will not necessarily provide the basis for a federal claim, *at least where the applicant has a state law remedy*.  Otherwise every disappointed applicant, even though the state provided reasonably adequate redress, could invoke federal jurisdiction on the claim that the state administrative body acted arbitrarily in violation of his federal due process rights.

758 F.2d at 58-59 (emphasis added and citations omitted).  The Second Circuit's reasoning in *Yale*

*Auto Parts,* where plaintiff claimed he had been improperly *denied* a permit, applies with equal force to the case at bar, where the Plaintiffs claim the Eckerts were improperly *granted* building permits.

For the foregoing reasons, the Plaintiffs have not alleged viable claims against the Town Defendants or any of them for violation of Plaintiffs' constitutional due process rights, substantive or procedural.  Defendants' motions to dismiss those claims will be granted.

### 3.   *Equal Protection*

Sprinkled about through the Second and Third Counts of the SAC are references to "equal protection of the laws," in connection which the Plaintiffs are characterized as "a class of one."

Frequently, the pleading uses "equal protection" in a vague and conclusory manner, joined together with other recognized constitutional claims.  Paragraph 175 of the SAC is typical of that usage.  It alleges that conduct of the Town Defendants in respect of certain notice provisions and opportunities to be heard under permit and variance procedures deprived the Reardons "of the right to petition and thereby denied them due process and equal protection of the laws as secured under the Fifth and Fourth Amendments."  Doc. 64 (SAC), ¶ 175.  This scattershot, laundry-list form of pleading does not facilitate analysis of whether the complaint sufficiently alleges a violation of any particular constitutional claim, such as equal protection.

The most particularized allegations in the SAC with respect to equal protection appear in those paragraphs which refer to what the pleading refers to as the Reardons' "Waterfront Parcel." This is an unimproved plot of land the Reardons own, separate from the lot on which their residential house stands.  As its name suggests, the Waterfront Parcel fronts directly upon the waters of Long Island Sound.

Paragraphs 29 and 30 of the SAC allege that from August 2009 into the winter of 2010, the Reardons had conversations with Town officials and expressed their concern about the size of the planned Eckert construction, as James Eckert described it to them. "In addition, the Reardons had conversations with defendant Keating about their plans for development and modification to their Waterfront Parcel. On each occasion, the town defendants said there was nothing they could or would do about the problems arising from the Eckert landfill and planned construction. Further, they were negative about the prospects for the Reardons' tentative Waterfront Parcel plans." *Id*., ¶¶ 29-30.

Some further details, apparently about those same conversations, appear in ¶ 177 of the SAC. It alleges that "Keating advised the plaintiffs that, if they wished to make any improvement or modification to their Waterfront Parcel, they would have to submit a Coastal Site Plan Review, give notice to abutters (including the Eckerts) and be subjected to public review." *Id.*, ¶ 177 An equal protection violation is alleged to have occurred when, "[i]n contrast to the treatment of Reardon's inquiries about improving their Waterfront Parcel," Keating allowed the Eckerts to do construction and place landfill "within a short distance of the Reardon Waterfront Parcel, and within the coastal boundary and within 100' of Long Island Sound," *id.*, ¶ 178, work the Eckerts undertook "without applying for or obtaining any permit to do so, and without submitting a Coastal Site Plan Review," *id.*, ¶ 180. These circumstances establish an equal protection claim, Plaintiffs charge in SAC ¶ 181, which alleges:

> The disparate and discriminatory treatment of the Reardon's plans, and the Eckerts' *fait accompli*, both in the coastal boundary area and both subject to the same ordinances and state laws, denied equal protection of the laws and was deliberate and without rational basis.

*Id.*, ¶ 181.

48

The concept of an equal protection claim brought by a "class of one" was formally recognized over a decade ago, when the Supreme Court decided *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*).  In that case, the Court granted certiorari to determine "whether the Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff did not allege membership in a class or group." 528 U.S. at 564.  Plaintiff Olech, a resident of the defendant Village, asked Village officials to  connect her property to the municipal water supply.  The Village conditioned the connection upon  plaintiff granting the Village a  33-foot easement.  Plaintiffs objected, asserting that the Village only required a 15-foot easement from other property owners seeking the same sort of access to the same water supply.  Plaintiff sued the Village, "claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection Clause of the Fourteenth Amendment.  Olech asserted that the 33-foot easement demand was "irrational and wholly arbitrary"; that the Village's demand was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village; and that "the Village acted either with the intent to deprive Olech of her rights or in reckless disregard of her rights."  *Id.* at 563.

The Court concluded that plaintiff's complaint stated a viable equal protection claim.  The *per curiam* opinion referred to earlier Supreme Court cases which "have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment."  *Id.* at 564 (citations omitted).  Turning immediately to the facts in *Olech*, the Court held:

> That reasoning is applicable to this case. Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners. The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15-foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis.

*Id*. at 564-565 (citation omitted).

Second Circuit cases which follow *Village of Willowbrook v. Olech* stress the special and particular facts a plaintiff must allege to state a plausible "class of one" equal protection claim. Those cases include *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58 (2010), *cert. denied*, 131 S.Ct. 824 (2010); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 158-59 (2d Cir. 2006); and *Neilson v. D'Angelis*, 409 F.3d 100, 104-05 (2d Cir. 2005), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

In *Ruston,* the plaintiff landowners-developers proposed to subdivide their lakefront property and build a 14-house development. They applied to the co-defendant Village of Skaneateles to hook up this proposed subdivision to the municipal sewer system. The Village denied plaintiffs' application. Plaintiffs sued on a "class of one" equal protection theory, identifying in the complaint "several properties that allegedly were allowed to connect to the Village's sewer system, all of them individual homes or businesses that (like the Rustons' land) were outside the Village but within the Town." 610 F.3d at 59.

The Second Circuit held that the plaintiffs failed to state a "class of one" equal protection claim. It concluded, as an initial point, that the pleading standard the Supreme Court set out in

*Ashcroft v. Iqbal,* 556 U.S. 662, 679-680 (2009), governed the case, so that "factual allegations must be sufficient to support necessary legal conclusions," and the question becomes whether the factual allegations in the complaint "plausibly suggest an entitlement to relief."   610 F.3d at 59 (citations and internal quotation marks omitted).   The Rustons' equal protection complaint failed to meet that standard.   It is useful to quote the Second Circuit's reasoning at length:

> We credit, as we must, the factual allegations that these other properties received sewer access while the Rustons' property did not. Nevertheless the complaint fails to state a claim that would support relief.
>
> Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.   Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.
>
> Under this standard, none of the properties cited by the Rustons suffice: a house built in 1987; a country club that was renovated in "the early 1990's"; two neighboring properties – "connected to the Village sewer system for decades"– that are not further described; a house built "in or around 2004"; a "luxury spa" built "in the late 1990's"; and a "large commercial building." None of these properties is similar to the Rustons' proposed 14-home development, let alone so similar that no rational person could see them as different: some are commercial properties versus the residential properties at issue, and the residential connections were single homes, not a new development as proposed by the Rustons.
>
> As the Rustons fail to allege that properties sufficiently similar to theirs were treated more favorably by either the Village or the Town, they have failed to state a "class of one" equal protection claim.

610 F.3d at 59-60 (citations and some internal quotation marks omitted).

During the quoted passage in *Ruston,* the Second Circuit cited and quoted from its earlier opinion in *Clubside*, which in turn cited and quoted from *Neilson*, where the court of appeals said:

> The similarity and equal protection inquiries are thus virtually one and the same in such a "class of one" case, and the standard for determining whether another person's circumstances are similar to the plaintiff's must be, as Purze states, whether they are "prima facie identical."

409 F.3d at 105.  *Purze,* which the Second Circuit cited with approval and quoted in *Neilson*, is the Seventh Circuit's opinion in *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002).[12]

The question that arises on these motions is whether the Reardons' factual allegations  "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston*, 610 F.3d at 59.  The only persons to whom the Reardons compare themselves are the Eckerts.  The pertinent allegations, stripped of conclusory embellishments, come down to this:  When the Reardons directed to Zoning Enforcement Officer Keating "inquiries about improving their Waterfront Parcel," Keating said they would have to submit to a Coastal Site Plan Review, while "the Eckerts had undertaken their construction without applying for or obtaining any permit to do so, and without submitting a Coastal Plan Site Review."  Doc. 78 (SAC), ¶¶ 178, 180.  This reference to "any permit" is puzzling, since it is common ground that in March 2010 the Eckerts applied to Keating for building permits and Keating issued them (improvidently, on Plaintiffs' theory

---

[12]    *Neilson* involved a "class of one" equal protection claim asserted against his superiors by a court officer who was disciplined for an unauthorized drawing of his firearm.  He contrasted that discipline with more lenient treatment of other officers in unrelated incidents.  A jury found in the plaintiff's favor.  The trial judge declined to set aside the judgment.  The Second Circuit reversed and dismissed the action, on the ground that the similarities in circumstances between the discipline imposed on  plaintiff and that of his identified comparators were insufficient as a matter of law to sustain an equal protection claim.

of the case). But it is the fact that the Eckerts were not required to go through the full Coastal Plan Site Review process. Mr. Kaufman's September 29, 2010 letter to Town officials argued unsuccessfully that the Eckerts' construction plans required one.

Thus the SAC's allegations establish a difference in Keating's reactions to these two families. The case turns on the surrounding circumstances for each. In *Neilson* the Second Circuit, citing and quoting the Seventh Circuit in *Purze*, said that the circumstances between a plaintiff and an identified comparator must be so similar as to be " *prima facie* identical." 409 F.3d at 104. In *Ruston* the Second Circuit elaborated on that theme by holding that a class-of-one equal protection plaintiff must establish that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," 610 F.3d at 60, or in other words, properties "so similar that no rational person could see them as different," *id*.

Do the Reardons' equal protection allegations satisfy those exacting standards? The phrase "equal protection," in the form of a legal conclusion, appears throughout the SAC. "Under *Iqbal*, factual allegations must be sufficient to support necessary legal conclusions." *Ruston*, 610 F.3d at 59 (citing *Iqbal*, 119 S.Ct. at 1950-51). One must begin with the recognition that the SAC contains no particulars with respect to what the Reardons had in mind for their Waterfront Parcel. We are told only that the Reardons made "inquiries" on the subject while conversing with Keating, seemingly during the course of expressing concern about the Eckerts' plans. So far as the SAC alleges or the record reveals, the Reardons have never reduced or perfected those inquiries about, or notions of, improvements of the Waterfront Parcel to written and detailed construction plans. The situation with respect to the Eckerts is strikingly different. Their application to Keating for a

building permit to enlarge their existing house was accompanied by detailed engineering and construction plans.

That difference in circumstances leads to a consideration of differences in the pertinent provisions of the DZR, which are read in conjunction with the Connecticut Coastal Management Act. The Act delineates the statutory coastal area as 1,000 feet "from the mean high water mark" of the Sound. Sections 813 and 813.1(a) of the Regulations exempt "from the coastal site plan review requirements "of the Act "[a]dditions to, or modifications of, existing buildings" that are "beyond 100 feet of the mean high tide line," in instances "where no potential adverse impacts can be determined." The Eckerts' existing house, which they wished to enlarge, was within 1,000 feet of the mean high water mark, but *beyond* 100 feet of the mean high tide line. Accordingly, the Town zoning officials had discretion to exempt the Eckerts' construction plans from a Coastal Plan Site Review. The record shows they did so. The parties dispute whether that exemption was rightly or wrongly given. The dispute appears to turn upon whether the zoning officer's requisite conditional determination that there would be "no potential adverse impacts" was arbitrarily or irrationally given. That is a state law question. It has nothing to do with the constitutional equal protection question. In any event, Keating, having apparently determined that the Eckerts' project would be exempted in accordance with the Regulations, had no reason to caution the Eckerts about the necessity of the Coastal Plan Site Review process.[13]

As for the Reardons, if during their conversations with Keating they inquired about or

---

[13]   The Plaintiffs' pleading and brief refer to a golf practice tee the Eckerts constructed on their property. While that modest addition may be within 100 feet of the mean high tide line, it is *de minimis* for purposes of equal protection analysis. What the Plaintiffs complain of is the extensive addition to the Eckerts' house, which obstructs the Reardons' water view.

suggested the possibility of some sort of construction *within* 100 feet of the mean high tide line, the Regulations conferred no power upon Town officials to exempt such construction from site review procedures, and Keating was bound to advise the Reardons to that effect.

One cannot tell if this is what occurred, because the SAC gives no details with respect to the "inquiries" the Reardons posed to Keating. But the statute and regulations furnish a plausible basis for the difference in Keating's reaction with respect to the Eckert and Reardon properties. And the SAC falls well short of alleging that the Town Defendants' conduct concerning the Eckert Property was "*prima facie* identical" to their conduct concerning the Reardon Waterfront Parcel.

Second Circuit cases require the Reardons to show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves," namely the Eckerts. *Ruston*, 610 F.3d at 59 (citing and quoting *Clubside,* 468 F.3d at 159). In the case at bar, that would require the Reardons to allege in substance that they expressed to Keating plans to construct on their Waterfront Parcel, within 1,000 feet of the mean high tide line but beyond 100 feet of it, a house as large as the Eckerts' planned expansion, and Keating required a Coastal Plan Site Review process for the Reardon project, but exempted the Eckert project from the process. Such allegations would echo the equal protection allegations the Supreme Court found sufficient in *Village of Willowbrook v. Olech*: a homeowner, alone of all homeowners in the community, being required to grant a 33-foot easement to connect to the water supply while everyone else had to grant only a 15-foot easement. The Reardons make no comparable allegations, and may very well be unable to do so consistent with Rule 11(b), Fed. R. Civ. P.

I conclude that the SAC fails to state a claim for a violation by the Town Defendants of the Plaintiffs' constitutional right to the equal protection of the laws. The Defendants' motions to

dismiss that claim will be granted.

**B.**     <u>**Supplemental Jurisdiction**</u>

Since, for the reasons stated, all federal constitutional claims Plaintiffs allege in the SAC will be dismissed with prejudice, the state law claims, asserted pursuant to principles of supplemental jurisdiction under 28 U.S.C. § 1367, will be dismissed without prejudice.

This is the accepted and approved practice in cases of this nature. *See, e.g., Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir. 1991) (holding that "if [all] federal claims are dismissed before trial . . . [then] the state claims should be dismissed as well.").  Whether to exercise supplemental jurisdiction rests in the discretion of the district court.  28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction").  In the case at bar, it is particularly appropriate for this Court to decline to exercise jurisdiction over the Plaintiffs' state law claims, because core questions concerning those claims are presently being litigated in the state courts, having progressed so far that the parties are waiting for the Supreme Court of the State to decide them.

**III.  CONCLUSION**

For the foregoing reasons, the motions of the Town Defendants [Doc. 71], joined by the Eckert Defendants [Doc. 65 & 67], to dismiss Count I, Count II, and Count III of the Plaintiffs' Second Amended Complaint  are GRANTED.  Those Counts are dismissed WITH PREJUDICE.

The motions to dismiss Count IV and Count V are GRANTED.  Those Counts are dismissed WITHOUT PREJUDICE.

The Defendants' prior motions to dismiss the First Amended Complaint [Doc. 24, 26, and

29] are all DENIED AS MOOT.

The Clerk is directed to close this case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        October 29, 2013


                              /s/Charles S. Haight, Jr.
                              CHARLES S. HAIGHT, JR.
                              Senior United States District Judge